UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Brenda Reardon,

    Plaintiff,

    v().                                                                                         Civil Action No. 2:11-CV-11

Michael J. Astrue,
Commissioner of Social Security,

    Defendant.

## OPINION AND ORDER
(Docs. 12, 22)

Plaintiff Brenda Reardon brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act, requesting review and remand of the decision of the Commissioner of Social Security ("Commissioner") denying her applications for supplemental security income and disability insurance benefits. Pending before the Court are Reardon's Motion for Order Reversing the Commissioner's Decision (Doc. 12), and the Commissioner's Motion for Order Affirming the Decision of the Commissioner (Doc. 22). For the reasons stated below, the Court GRANTS the claimant's Motion, in part, and DENIES the Commissioner's Motion.

## Background

Reardon was thirty-two years old on the alleged disability onset date of February 28, 2007. (AR 29-30.) She graduated from high school and has held a number of jobs, including housekeeper, laundry sorter, and waitress. (AR 30, 157.) In February

2007, she stopped working due to her anxiety, depression, and attention deficit hyperactivity disorder ("ADHD"). (AR 30.) Additionally, Reardon has a long history of substance abuse, but has been sober since April 2008. (AR 31, 457.) Reardon testified at her administrative hearing that she has "a hard time getting out of bed to make [her] appointments, to go to work or to focus" (AR 30), and that she takes medication, such as Celexa and Neurontin to abate her ailments and naltrexone to abate substance abuse. (AR 162.)

In August 2008, Reardon filed applications for supplemental security income and disability insurance benefits. (AR 125-132.) In support of these applications, Reardon alleged multiple mental disorders, including depression, anxiety, posttraumatic stress disorder ("PTSD"), and ADHD. (AR 183.) Reardon's applications were denied initially and on reconsideration. (AR 51-63.)

On May 7, 2010, Administrative Law Judge ("ALJ") Thomas Merrill conducted a hearing on Reardon's applications. (AR 26.) At the hearing, Reardon was represented by counsel and testified on her own behalf. (AR 28-29.) On August 17, 2010, the ALJ issued a decision finding Reardon not disabled under the Social Security Act. (AR 19.) Thereafter, the Decision Review Board selected the ALJ's determination for review, but did not do so during the time allowed. As a result, the ALJ's decision became final. Having exhausted her administrative remedies, Reardon commenced this action on January 12, 2011. (Doc. 3.)

## ALJ Determination

The Commissioner uses a five-step sequential process to evaluate disability claims. *See Butts v. Barnhart*, 388 F.3d 377, 380-81 (2d Cir. 2004). The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial gainful activity" ("SGA"). 20 C.F.R. §§ 404.1520(b), 416.920(b). If the claimant is not so engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment." 20 C.F.R. §§ 404.1520(c), 416.920(c). If the ALJ finds that the claimant has a severe impairment, the third step requires the ALJ to make a determination as to whether the claimant's impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings"). 20 C.F.R. §§ 404.1520(d), 416.920(d). The claimant is presumptively disabled if the impairment meets or equals a listed impairment. *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the fourth step requires the ALJ to consider whether the claimant's residual functional capacity ("RFC") precludes the performance of his or her past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). The fifth and final step commands that the ALJ determine whether the claimant can do "any other work." 20 C.F.R. §§ 404.1520(g), 416.920(g). The claimant bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's [RFC]").

Employing this sequential analysis, the ALJ first determined that Reardon had not engaged in SGA since February 28, 2007, her revised onset date. (AR 10, 30.) Next, the ALJ found that Reardon had the severe impairment of a history of polysubstance abuse and dependence. (*Id*.) The ALJ concluded that Reardon's adjustment disorder and cognitive disorder were not severe impairments. (AR 12.) Proceeding to step three, the ALJ found that Reardon did not have an impairment or combination of impairments that met or medically equaled a listed impairment. (*Id*.) The ALJ then determined that Reardon had the RFC to perform:

> [A] full range of work at all exertional levels but with the following nonexertional limitations: the claimant can understand and remember two to three steps instructions of a routine nature. She can sustain attention and concentration for routine tasks and maintain effort for extended periods of time over the course of a normal workday/week in a setting that does not require adherence to strict time and production quotas. The claimant is able to engage in brief superficial interactions on an individual basis. She is capable of typical interactions with co-workers and supervisors while completing routine tasks. Stress tolerance is acceptable for a routine and stable work setting with minimal external distractions. She can adapt to minor changes in routine. She may require additional supervisory support to learn new tasks, but she is capable of independent goal directed behavior.

(AR 13.) Relying on this assessment, the ALJ found that Reardon was capable of performing her past relevant work as a housekeeper, laundry sorter, or lumber sorter. (AR 16.) The ALJ alternatively proceeded to step five and determined that based on Reardon's "education, work experience, and residual functional capacity, there [were] jobs that exist[ed] in significant numbers in the national economy that [she could] perform." (*Id.*) Thus, the ALJ concluded that Reardon had not been under a disability since the onset date of February 28, 2007. (AR 18.)

## **Standard of Review**

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A person will be found disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

In reviewing a Commissioner's disability decision, the court limits its inquiry to a "review [of] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard." *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g). A court's factual review of the Commissioner's decision is restricted to determining whether "substantial evidence" exists in the record to support such decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *Poupore*, 566 F.3d at 305.

Although the reviewing court's role in reviewing the Commissioner's disability decision is "quite limited[,] and substantial deference is to be afforded [that] decision," *Hernandez v. Barnhart*, No. 05-9586, 2007 WL 2710388, at *7 (S.D.N.Y. Sept. 18, 2007) (internal quotation marks omitted), the Social Security Act "must be construed liberally because it is a remedial statute that is intended to include, rather than exclude, potential recipients of benefits," *Jones v. Apfel*, 66 F. Supp. 2d 518, 522 (S.D.N.Y. 1999); *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981) ("In its deliberations the District Court should consider the fact that the Social Security Act is a remedial statute to be broadly construed and liberally applied.").

## **Analysis**

Reardon claims that the ALJ erred by failing to give controlling weight to the opinion of a treating physician opinion pursuant to the regulations. (Doc. 12-2 at 4.) Alternatively, Reardon contends that the ALJ failed to provide a good reason for rejecting the treating physician's opinion as the ALJ is required to do under the law. (Doc. 12-2 at 11.) The latter claim is persuasive.

"With respect to the nature and severity of [a claimant's] impairment(s) . . . [t]he [Social Security Administration] recognizes a treating physician rule of deference to the views of the physician who has engaged in the primary treatment of the claimant." *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (citations and internal quotation marks omitted); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). Courts have acknowledged, however, that despite this "special respect . . . [these opinions] need not be given controlling weight where they are contradicted by other substantial evidence in the

6

record." *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) (citations omitted). It is well settled that the conflicting opinions of other medical experts, including consultative physicians, "may constitute such [substantial] evidence." *Mongeur v. Heckler*, 722 F.2d 1033, 1039 (2d Cir. 1983); *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004).

If "[a]n ALJ . . . refuses to accord controlling weight to the medical opinion of a treating physician," then he "must consider various 'factors' to determine how much weight to give to the opinion." *Halloran*, 362 F.3d at 32. These factors include (1) "the frequency of examination and the length, nature and extent of the treatment relationship;" (2) "the evidence in support of the treating physician's opinion;" (3) "the consistency of the opinion with the record as a whole;" (4) "whether the opinion is from a specialist;" and (5) "other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion." *Id*. (citing 20 C.F.R. § 404.1527(d)(2)). Beyond dispute, "the Commissioner's failure to provide 'good reasons' for apparently affording no weight to the opinion of plaintiff's treating physician constitute[s] legal error." *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998). For this reason, "[t]he failure to follow this rule, standing alone, requires [r]emand." *Pogozelski v. Barnhart*, No. 03 CV 2914(JG), 2004 WL 1146059, at *12 (E.D.N.Y. May 19, 2004) (citing *Mejia v. Barnhart*, 261 F. Supp. 2d 142, 148 (E.D.N.Y. 2003)).

In an April 28, 2010 medical source statement, Reardon's treating physician, Dr. Wayne Warnken, stated that Reardon suffered a substantial loss of ability "to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances." (AR 835.) In addition, Dr. Warnken opined that Reardon had a

7

substantial loss of ability "to maintain regular attention for extended periods of 2-hour segments" and "to accept instructions and respond appropriately to criticism from supervisors."[1] (*Id.*)  The ALJ afforded Dr. Warnken's April 2010 opinion only "moderate weight," explicitly rejecting his assessment that Reardon had a moderate impairment in activities of daily living. (AR 16.)  The ALJ also highlighted certain aspects of Dr. Warnken's opinions, namely, that Reardon was "capable of performing well in a structured setting," that her "condition ha[d] improved despite the fact that she ha[d] missed about one-quarter of her appointments," and that she "had moderate impairment with regard to social interaction and concentration, pace, and persistence." (AR 16, 834-37.)  This brief summary was the extent of the ALJ's discussion of Dr. Warnken's medical opinions.

During the administrative hearing on May 7, 2010, the ALJ crafted a hypothetical question for the vocational expert based on limitations contained in Dr. Warnken's April 2010 opinion.  (*See* AR 43-44.)  The vocational expert testified that, given these limitations, a claimant would not be able to perform any work. (AR 44.)  The ALJ, therefore, was aware that these particular aspects of Dr. Warnken's opinion were seminal in the ultimate question of disability.  Nevertheless, the ALJ failed to discuss their weight or even acknowledge their existence in his decision. (AR 16.)  Nor is it clear, based on the ALJ's analysis, that he was aware that Dr. Warnken was Reardon's treating

---

[1] The Court notes that several of these opinions are merely checked boxes on a form and are not explained in great detail. (*See* AR 835.)  As a result, this part of Dr. Warnken's opinion may be entitled to less weight.  *See Halloran*, 362 F.3d at 31 n.2 (providing that a "standardized form . . . is only marginally useful for purposes of creating a meaningful and reviewable factual record" if unexplained); *see also* 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3).

physician, as he made no mention of this fact and failed to explicitly consider any of the aforementioned factors. (*See id.*) Rather, for unstated reasons, the ALJ implicitly rejected this part of Dr. Warnken's opinion in favor of an RFC that Reardon "can sustain attention and concentration for routine tasks and maintain effort for extended periods of time over the course of a normal workday/week in a setting that does not require adherence to strict time and production quotas." (AR13.) This failure to provide a good reason for ignoring the opinion of Reardon's treating physician is contrary to law. *See Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999) (holding that a good reason must inform the claimant "why the Commissioner has decided . . . to disagree with [a treating physician]"); *Schaal*, 134 F.3d at 505 (holding that "the proper course is to direct that [a] case be remanded to the SSA to allow the ALJ to reweigh the evidence" when "the Commissioner failed to provide plaintiff with 'good reasons' for the lack of weight attributed to [a] treating physician's opinion"); *Carpenter v. Astrue*, No. 5:10-cv-249, 2011 WL 3951623, at *6 (D. Vt. Sept. 7, 2011).

The record shows that Reardon began seeing Dr. Warnken on March 18, 2008. (AR 475.) At that time, Dr. Warnken diagnosed Reardon with a depressive disorder and noted her "poor insight," "poor judgment," "poor attention span and concentration (characterized as slow response)." (AR 476.) Shortly thereafter, Dr. Warnken also diagnosed Reardon with ADHD. (AR 479.) Over the next two years, Dr. Warnken treated Reardon regularly. (AR 475, 478, 480, 485, 509, 512, 515, 517, 521, 701, 704.) It is clear that some of Dr. Warnken's treatment notes support and are consistent with the opinions expressed in his April 2010 medical source statement. For example, in April

9

2008, Dr. Warnken provided that Reardon had "anxious, fearful thoughts, compulsive thoughts or behaviors, irritable mood, diminished interest or pleasure, fatigue or loss of energy, feelings of guilt or worthlessness, manic episodes, panic attacks, poor concentration, indecisiveness, restlessness or sluggishness, significant change in appetite . . . and sleep disturbance." (AR 478.) He recorded a continuation of many of these symptoms in July 2008. (AR 480.) In July 2009, Dr. Warnken recorded that Reardon's symptoms included: "bored easily, difficulty waiting for turn, emotionally labile, excitable, frustrated easily, impulsive, inattentive, loses/forgets things frequently, restless, short attention span, talks excessively, distracted easily and sleep disturbance." (AR 724.) Dr. Warnken also noted that Reardon was "disorganized, fidgets/squirms, [makes] frequent careless mistakes, [has a] poor self[-]image, [is] reckless and [is] unable to follow directions." (*Id.*) In October 2009, Dr. Warnken recorded Reardon's claim that she had a "hard time sleeping and getting up in the morning" and "d[id] not feel she could be a reliable worker." (AR 713.) On December 22, 2009, Dr. Warnken again noted that Reardon was "disorganized, fidgets/squirms, frustrated easily, short attention span and distracted easily." (AR 704.) Dr. Warnken made the same observations again on January 19, 2010. (AR 701.)

It must be acknowledged that the evidence from Dr. Warnken is not entirely consistent. For example, throughout Reardon's two years of treatment, Dr. Warnken often observed that she showed "[n]o unusual anxiety or evidence of depression." (AR 481, 511, 729, 734, 737, 744.) Dr. Warnken also noted Reardon's normal attention span and concentration, as well as the fact that she was alert and oriented at numerous

10

appointments.  (AR 698, 710, 729, 734.)  Furthermore, Dr. Warnken's records indicate that Reardon's symptoms for both depression and ADHD improved with medication.  (AR 693, 696, 727, 736, 739, 741, 743.)

Other evidence is similarly inconsistent.  For example, Reardon's regular therapist, Victoria Colvin, reported in a medical source statement that Reardon had a substantial loss of ability to maintain attention, perform activities within a schedule, maintain regular attendance, be punctual, and accept instructions.  (*See* AR 797.)  Colvin further opined that Reardon would be absent from work on a fairly persistent basis due to her ongoing mental health issues.  (AR 798.)  A neuropsychological evaluation performed on Reardon in June 2008 revealed that she "performed in the average to high average range on numerous cognitive measures of executive function in the structured testing context," despite reporting "difficulties in a number of executive domains in her daily activities" in a less structured environment.  (AR 378.)  The report acknowledged her purported "severe symptoms consistent with depression and anxiety," which impacted "her functional capacity and/or on her and her treatment providers' perception of functional impairment."  (*Id.*)  Ultimately, the evaluation concluded that Reardon's reported symptoms "suggested mild current anxiety and a severe level of anxiety in overall functioning . . . suggest[ing] that her emotional functioning is likely to affect her cognitive functioning in daily life."  (AR 377.)  Finally, Community Health Center of Burlington therapists Doug Bugbee, Naya Pyskacek, and Karen Schumacher characterized Reardon's depressive disorder as major in 2009.  (AR 706, 716, 722.)

11

In contrast, non-examining consultant physician Dr. J. Coyle opined that Reardon could "sustain [attention/concentration] for routine tasks and maintain effort for extended periods of time over the course of a normal work day/week in a setting that does not require adherence to strict time and productions quotas." (AR 503.) Dr. Coyle also opined that Reardon's "[m]ood was mildly depressed" and that she "displayed blunted affect," despite her "logical and goal directed" thinking. (AR 499.) Although Drs. Warnken and Coyle were in agreement regarding most aspects of Reardon's mental functional capacity, they disagreed as to her ability to maintain attendance—Dr. Coyle providing that she could "perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances" and, as previously discussed, Dr. Warnken stating that she could not maintain regular attendance. (AR 501, 835.) In her functional report, Reardon described in great detail her daily routines, which include waking up at 6:30 a.m., organizing the items she needed for her planned activities, purchasing a cup of coffee at the store, going to the library, and attending counseling. (AR 173.) Reardon also reported that she performed daily chores, such as cleaning, laundry, and ironing, and is reportedly able to maintain personal finances. (AR175-76.) These activities suggest at least some ability to maintain a schedule, despite her reported inability to remain focused. (AR 173, 176, 178.)

Although it is clear that an ALJ need not "reconcile explicitly every conflicting shred of medical testimony," *Fiorello v. Heckler*, 725 F.2d 174, 176 (2d Cir. 1983), the ALJ must indicate which factors were reviewed when rejecting the opinion of a treating physician, *see Schnetzler v. Astrue*, 533 F. Supp. 2d 272, 287 (E.D.N.Y. 2008). Here, the

ALJ failed to provide any discussion of the aforementioned determinative aspects of Dr. Warnken's opinions and why he chose not to give them controlling weight. (AR 16.) Thus, a remand is necessary because the ALJ failed to provide good reasons for his decision, despite the existence of at least some record evidence that supported it. *See Snell*, 177 F.3d at 134.

## Conclusion

For these reasons, the Court GRANTS Plaintiff's Motion (Doc. 12), in part, DENIES the Commissioner's Motion (Doc. 22), and REMANDS the matter for further proceedings and a new decision, in accordance with this opinion. The Court DENIES that portion of the Plaintiff's Motion seeking an award of benefits given that it cannot be said that a remand for further administrative proceedings would serve no purpose.

Dated at Burlington, in the District of Vermont, this 23rd day of April, 2012.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge